UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| I. STEPHEN RABIN,<br><br>                   Plaintiff,<br><br>                   -vs –<br><br>THE NEW YORK TIMES CO. et. al.,<br><br>                   Defendants. | CASE NO.14-CV-4498 (JSR)<br><br>ECF Case |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**

Raymond A. Bragar
BRAGAR EAGEL & SQUIRE, P.C.
885 Third Avenue – Suite 3040
New York, NY  10022
(212) 308-5858
bragar@bespc.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

I.  THE AMENDED COMPLAINT STATES A CLAIM FOR AIDING AND
    ABETTING FRAUD ...................................................................................................3

    A.  Defendants Admit the Underlying Fraud Exists and that they Knew It .................3

    B.  Defendants Substantially Assisted CBS in Accomplishing the Fraud ..................5

    C.  Defendants were Obligated to Return Mr. Rabin's Defrauded Payments ............6

    D.  "Strong Inference" of Fraudulent Intent is not an Additional Requisite to
        State a Claim for Aiding and Abetting Fraud ........................................................8

    E.  The Complaint Alleges Individual Wrongs by Each of the Defendants ..............10

II. THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATION OF GEN.
BUS. LAW § 349  ........................................................................................................13

III. THE AMENDED COMPLAINT STATES A CLAIM FOR NEGLIGENCE ..................17

CONCLUSION................................................................................................................21

# TABLE OF AUTHORITIES

Cases:

ABF Capital Mgmt. v. Askin Capital Mgmt.,
    957 F.Supp.1308 (S.D.N.Y. 1997) ..................................................................... 10

Ackerman v. Coca-Cola Co.,
    2010 U.S. Dist. LEXIS 73156 (E.D.N.Y. July 21, 2010) ................................. 15,16

Adelphi Recovery Trust v. Bank of America, N.A.,
    624 F.Supp.2d 292 (S.D.N.Y. 2009) ................................................................. 12

Amoruso v. New York City Transit Authority,
    12 A.D.2d 11, 207 N.Y.S.2d 855 (N.Y. App. Div. 1st Dept. 1960)....................... 18

Atlantic Gypsum Co. v. Lloyds Int'l Bank,
    753 F.Supp.505 (S.D.N.Y. 1990) ...................................................................... 10

Banque Worms v. BankAmerica Int'l,
    77 N.Y.2d 362 (N.Y. 1991)................................................................................... 6

Canestaro v. Raymour & Flanigan Furniture Co.,
    42 Misc.3d 1210(A), 984 N.Y.S.2d 630 (N.Y. Sup. Ct. 2013) ............................ 16

Goldberg v. Manhattan Ford Lincoln-Mercury, Inc.,
    129 Misc.2d 123, 492 N.Y.S.2d 318 (N.Y. Sup. Ct. 1985) .................................. 16

Hamilton v. Beretta U.S.A. Corp.,
    96 N.Y.2d 222, 727 N.Y.S.2d 7 (N.Y. 2001) ................................................... 17,18

In re Agape Litig.,
    773 F.Supp.2d 298 (E.D.N.Y. 2011) .................................................................... 9

In re LIBOR-Based Fin. Instruments Antitrust Litig.,
    2014 U.S. Dist. LEXIS 86765 (S.D.N.Y. 1990) .................................................. 12

JP Morgan Chase Bank v. Winnick,
    406 F.Supp.2d 247 (S.D.N.Y. 2005) .................................................................... 5

Jernow v. Wendy's International, Inc.,
    2007 U.S. Dist. LEXIS 85104 (S.D.N.Y. Nov. 15, 2007) ...................................... 15

*Kazanoff v. United States,*
    945 F.2d 32 (2d Cir. 1991) ................................................................. 18

*Krys v. Pigott,*
    749 F.3d 117 (2d Cir. 2014) ............................................................... 3,8

*Lerner v. Fleet Bank, N.A.,*
    459 F.3d 273 (2d Cir. 2006) ................................................................. 3

*Manufacturers Hanover Trust Co. v. Chemical Bank,*
    160 A.D.2d 113, 559 N.Y.S.2d 704 (1st Dept. 1990) ........................... 7

*Miller v. Holtzbrinck Publrs., LLC,*
    2009 U.S. Dist. LEXIS 18973 (S.D.N.Y. March 3, 2009),
    aff'd 377 Fed. Appx. 72 (2d Cir. 2010) ............................................. 13

*Moody v. Morris,*
    608 F.Supp.2d 575 (S.D.N.Y. 2009), aff'd 407 F.Appx. 434 (Fed. Cir.
    2011).................................................................................................. 13

*Morin v. Trupin,*
    747 F.Supp.1051 (S.D.N.Y. 1990) .................................................... 12

*Oster v. Kirschner,*
    77 A.D.3d 51 (1st Dept.  2010) .......................................................... 3

*Pelman v. McDonald's Corp.,*
    396 F.3d 508 (2d Cir. 2005) .............................................................. 15

*Prudential Ins. Co. of America v. Credit Suisse Secs. LLC,*
    2013 U.S. Dist. LEXIS 142191 (D.N.J. Sept. 30, 2013) ..................... 11

*Renner v. Chase Manhattan Bank,*
    2000 U.S. Dist. LEXIS 8552 (S.D.N.Y. June 16, 2000)........................ 9

*Sheppard v. Manhattan Club Timeshare Ass'n, Inc.,*
    2012 U.S. Dist. LEXIS 72902 (S.D.N.Y. May 23, 2012)..................... 12

*Sofi Classic S.A. de C.V. v. Hurowitz,*
    444 F.Supp.2d 231 (S.D.N.Y. 2006) ................................................. 12

*Soule v. Norton,*
    299 A.D.2d 827, 750 N.Y.S.2d 692 (4th Dept. 2002)...................... 13,14

*Super Glue Corp. v. Avis Rent A Car System, Inc.,*
 159 A.D.2d 68, 557 N.Y.S.2d 959 (N.Y. App. Div. 2d Dept. 1990) .................... 16


*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe, & Maw LLP,*
 612 F.Supp.2d 267 (S.D.N.Y. 2009) .................................................... 13

*United States v. Madakor,*
 29 Fed. Appx. 636 (2d Cir. 2002)...................................................... 7

Statutes:

N.Y. General Business Law § 349 ......................................................... 13-17

Plaintiff I. Stephen Rabin ("Plaintiff") respectfully submits this Memorandum of Law in opposition to the joint Motion to Dismiss the Amended Complaint brought by defendant Dow Jones & Company ("Dow Jones") and Forbes, Inc. ("Forbes").[1] Dow Jones and Forbes are collectively referred to as the "Publishers."

## Preliminary Statement

The basic facts are undisputed:

a. A cluster of entities ("CBS") have been engaged in a fraudulent subscription scheme involving subscribers of the Publishers' publications, the Wall Street Journal, Barrons, and Forbes Magazine.

b. The Publishers have been aware of the fraudulent scheme for years.

c. The Publishers received payments from CBS that they knew were procured by fraud as part of the fraudulent scheme.

d. Prior to the commencement of this action, the Publishers neither returned any part of the payments to their subscribers nor did they provide individualized notice of the fraudulent scheme to their subscribers.

e. Plaintiff has set forth specific transactions with CBS that resulted in fraudulent funds being transmitted to the Publishers and, prior to this action, received none of the funds back and did not receive notice of the fraud except late in 2012 in a Barron's advertisement.

Plaintiff will show in this Memorandum how these five facts support all three counts of the Amended Complaint, notwithstanding the Publishers' arguments.

## Facts

The Publishers do not deny that the Amended Complaint pleads in detail the CBS fraudulent scheme. (Amended Complaint ¶¶ 8-10). Nor do the Publishers deny that the Amended Complaint alleges that each Publisher knew of the fraudulent scheme because each (a) hired employees to investigate the

---

[1] The third defendant, the New York Times Company, has settled with Plaintiff, providing substantial relief to its subscribers.

scheme; (b) knew that they were receiving funds fraudulently solicited by CBS; and (c) knew that funds received from CBS were for subscribers whose subscriptions had not expired. (Amended Complaint ¶ 14).   In addition the Amended Complaint contains in Ex. 1 an advertisement in Barron's from November 11, 2013, warning of the scheme. Dow Jones also provided a similar advertisement in its opposition papers from the Wall Street Journal from the same day. (Declaration of Hilary Preston, dated August 14, 2014, Ex. B) ("Preston Dec.").

The Amended Complaint also sets out the specific transactions in which Plaintiff made payments to CBS for each of the Publishers (Amended Complaint ¶ 26 and Ex. 5) as follows[2]:

|          |                    |           |           |
|----------|--------------------|-----------|-----------|
| Dow Jones |                   |           |           |
|          | Barron's           | 7/22/2011 | $299.95   |
|          | Barron's           | 6/11/2012 | $169.95   |
|          | Barron's           | 3/22/2013 | $299.95   |
|          | Barron's           | 7/24/2013 | $299.95   |
|          |                    |           |           |
|          | Wall Street Journal | 6/11/2012 | $249.95  |
|          | Wall Street Journal | 9/11/2013 | $599.95  |
|          |                    |           |           |
| Forbes   |                    |           |           |
|          | Forbes             | 6/11/2012 | $119      |
|          | Forbes             | 9/21/2012 | $119      |
|          | Forbes             | 4/28/2013 | $84.52    |
|          | Forbes             | 7/24/2013 | $119.95[3] |

Plaintiff also alleges that, prior to the commencement of this action, he did not receive back any of these funds or notice to him of the fraud from the Publishers. (Amended Complaint ¶ 27.)

---

[2] References to Plaintiff or Mr. Rabin include his wife, who routinely paid the family bills.
[3] Ex. 5 to the Amended Complaint also lists a payment to Forbes of $999.95 on 5/15/2013.   While Plaintiff's check register showed that payment, upon further investigation, it appears that payment was not for Forbes.

2

**Legal Argument**

**POINT I**
**THE AMENDED COMPLAINT STATES A CLAIM FOR**
<u>**AIDING AND ABETTING FRAUD**</u>

"To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'"  *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *see, Oster v. Kirschner*, 77 A.D.3d 55, 55 (1st Dept. 2010) ("A plaintiff alleging an aiding-and-abetting fraud claim must allege the existence of the underlying fraud, actual knowledge, and substantial assistance.").  The Amended Complaint alleges the existence of an underlying fraud by CBS, defendants Dow Jones and Forbes' knowledge of the fraud, and their substantial assistance to CBS in the achievement of the fraud.

**A.  <u>D</u>EFENDANTS <u>A</u>DMIT <u>T</u>HE <u>U</u>NDERLYING <u>F</u>RAUD <u>E</u>XISTS <u>A</u>ND <u>T</u>HAT <u>T</u>HEY <u>K</u>NEW <u>I</u>T**

The Amended Complaint alleges that Circulation Billing Services ("CBS") was engaged in an underlying fraud. CBS, appearing to be an agent of the defendants, solicited subscription renewals (and new orders) of publications on behalf of the defendants.  (Amended Complaint ¶¶ 1, 8-10).  CBS falsely represented, among other things, that plaintiff's subscription to particular publications were due for renewal and needed to be responded to by a date certain, and that the rates offered were the lowest rates available.  (Amended Complaint ¶¶ 1, 8-10, Ex. 2)  In fact, plaintiff's subscriptions were not due for

3

renewal and the rates offered were not the lowest rates available but were exorbitantly inflated.  Plaintiff alleges with particularity each specific publication involved, the date payment was made, the entity being paid, and the amounts of each such payment.  (Amended Complaint ¶ 26, Ex. 5).

Defendants neither dispute the existence of the fraud nor their knowledge of it.  Perhaps most importantly, defendants make no attempt in their motion to dismiss to take issue with the allegations in the Amended Complaint of the existence of the fraud and their knowledge of it.

Additionally defendant Dow Jones, the publisher of BARRON's and THE WALL STREET JOURNAL, published a warning to BARRON's subscribers in the November 11, 2013 issue of Barron's acknowledging the existence of the underlying fraud entitled:   "An Open Letter to Our Subscribers Regarding **Fraudulent** Renewal Notices" to alert them "to a **nationwide scam** that has affected subscribers to many publications, including Barron's."   (Amended Complaint ¶ 1, Ex. 1 (bold added)).  Dow Jones attached a nearly identical warning to THE WALL STREET JOURNAL subscribers in support of its motion to dismiss.  (Preston Dec. Ex. B).

Defendants also admit the existence of the underlying fraud and their knowledge of it on the instant motion:

> And discovery in this case would show that the Publishers have made substantial, **multi-year efforts to stop the scheme**, including working with law enforcement agencies that are investigating CBS.

Defs'. Br. at 7-8 (bold added).

In general, Exhibit 4 to the Amended Complaint indicates that the scam

4

was widely known.[4]

Accordingly, two of the three elements necessary for a valid aiding and abetting cause of action have been alleged and admitted.

**B.  DEFENDANTS SUBSTANTIALLY ASSISTED CBS IN ACCOMPLISHING THE FRAUD**

A defendant provides substantial assistance if it "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005).

Defendants' actions and failures to act enabled the fraud to proceed. Dow Jones and Forbes received funds from CBS for renewal of Plaintiff's subscriptions.  (Amended Complaint ¶¶ 11, 26, Ex. 5).  Accepting funds from CBS enabled CBS to perpetrate and continue to perpetrate the underlying fraud. (Amended Complaint ¶¶ 1, 13, 26).  Such actions led plaintiff to reasonably believe that CBS was a legitimate entity authorized to solicit renewals on behalf of defendants.  (Amended Complaint ¶ 11)  Moreover, defendants neither notified Mr. Rabin of the fraud nor offered to return the funds paid by Mr. Rabin and received by them via CBS.  (Amended Complaint ¶ 26, Ex. 5).

Defendants knew that Mr. Rabin had been misled into sending money to CBS which was then transmitted to them, in whole or in part.  Defendants' own records indicated that Mr. Rabin was making mistaken multiple payments.  He paid Forbes six times in slightly over a year- four payments within about six months.  Mr. Rabin owed nothing to defendants and his subscription had neither

---

[4] One of the bulletins in Exhibit 4 was issued by CBS, the television network. The television network has no connection with CBS, orchestrator of the fraud described in this case.

lapsed nor was about to lapse.  Defendants had, as a result of Mr. Rabin being deceived, received a payment to which they were not entitled.  They were obligated to notify Mr. Rabin of the deception so that the deception could be corrected by returning the money or otherwise by mutual agreement.

In any event, if Mr. Rabin had been notified, the fraud would have collapsed vis-à-vis Mr. Rabin and the defendants.  He would not have continued to make payments for magazine subscriptions which had not lapsed.

Defendants substantially assisted CBS in perpetration of the fraud. Furthermore, by continuing to do business with CBS, which defendants *knew* was a fraudulent entity engaged in fraudulent practices, defendants helped to conceal the fraud, enabling it to proceed.

### C. DEFENDANTS WERE OBLIGATED TO RETURN MR. RABIN'S DEFRAUDED PAYMENTS

A person who receives a mistaken payment is obligated to return the payment, or at the very least, to inform the person who made the mistake and offer options to make whole the person who made the mistake.  If the person who made the mistake insists upon return of the payment, the person who benefited will have to comply.  In *Banque Worms v. BankAmerica Int'l*, the New York Court of Appeals expressly so held:

> In the area of restitution, New York has long recognized the rule that if A pays money to B upon the erroneous assumption of the former that he is indebted to the latter, an action may be maintained for its recovery.  The reason for the rule is obvious.  Since A was mistaken in the assumption that he was indebted to B, the latter is not entitled to retain the money acquired by mistake of the former, even though the mistake is the result of negligence.
>
> * * *
>
> This rule has evolved into the "mistake of fact" doctrine, in

> which detrimental reliance is a requisite factor, and which
> provides that "money paid" under a mistake of fact may be
> recovered back, however negligent the party paying may
> have been in making the mistake …

77 N.Y.2d 362, 366 (1991) (internal quotations omitted).   *See also U.S. v. Madakor*, 29 Fed. Appx. 636, 638 (2d Cir. 2002) ("New York law clearly recognizes the 'mistake of fact' doctrine, and money paid under a mistake of fact may be recovered." (internal quotation omitted)); *Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 117 (1st Dept. 1990) ("The principle that a party who pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back is long standing and well recognized … and applies even if the mistake is due to the negligence of the payor." (internal citation omitted)).

If a party is obliged to return a payment knowingly received by mistake, surely a party is obliged to return a payment knowingly received as a result of fraud, even though the payment comes from a third party as part of the fraud. Defendants do not suspect, they <u>know</u> CBS is engaged in a widespread scam involving "Fraudulent Renewal Notices."  When CBS remits, in whole or in part, the payment received from Mr. Rabin, the defendants <u>know</u> that Mr. Rabin has been scammed, and that he has been deceived—CBS has struck again.  They have an obligation to contact Mr. Rabin who is already a subscriber.  By not contacting him, they allowed the scam to continue.  This is precisely what happened here; Mr. Rabin continued to be scammed and defendants continued to receive payments. Defendants' failure to contact Mr. Rabin or send him back the defrauded funds also shows how their proximate cause argument fails.  If

7

Defendants had returned the funds they knew had been fraudulently obtained, Mr. Rabin could have saved the funds returned and would have avoided the future scam.

Defendants would presumably agree that Mr. Rabin has redress if he sent the defrauded payments directly to defendants.  But defendants argue that he has no redress if he sent the payments to them through a third person.  The legal result should be the same in both instances when defendants <u>know</u> that Mr. Rabin has been defrauded in making the payments via CBS as a conduit.

It was essential that Mr. Rabin not be contacted for the fraud to continue. This was substantial in allowing the fraud to proceed.

### D.  "STRONG INFERENCE" OF FRAUDULENT INTENT IS NOT AN ADDITIONAL REQUISITE TO STATE A CLAIM FOR AIDING AND ABETTING FRAUD

Defendants argue that in addition to the three requisite elements needed to state a claim for aiding and abetting fraud there is a fourth element:  plaintiff "must also plead the requisite 'strong inference' of" fraudulent intent."   Defs. Mem. at 16-17.  In turn the strong inference of fraudulent intent can be proven by motive and opportunity.   Thus, defendants claim that there are not three elements of an aiding and abetting claim, but five.

Defendants are wrong.  The Second Circuit's recent decision in *Krys v. Pigott*, held that plaintiff need only show the three requisite elements to establish liability for aiding and abetting fraud under New York law which included "facts to support the inference that the alleged aider and abettor had *actual knowledge* of the fraudulent scheme."  749 F.3d at 117 (emphasis added).  Here there is no need to resort to an *inference* of actual knowledge, defendants have admitted or

8

do not deny their actual knowledge.  A "strong inference" of fraudulent intent may be needed when, unlike here, there is no admission of actual knowledge.  A strong inference is merely a means by which the requisite actual knowledge may be inferred, when defendants have not admitted it.

Defendants' reliance on *Agape* is also wrong.  *In re Agape Litig.*, 773 F.Supp. 2d 298, 308 (E.D.N.Y. 2011) ("pleading knowledge for purposes of an aiding and abetting claim requires allegations of facts that give rise to a 'strong inference' of actual knowledge."   (citation omitted)).   In *Agape*, plaintiffs contended that Bank of America had actual knowledge of the fraud on three alternative grounds: (1) direct and/or circumstantial evidence of actual knowledge based on Bank of America's review of Agape's account activity and its close relationship with Agape personnel; (2) Bank of America's conscious avoidance of acquiring actual knowledge of the Agape fraud; and (3) Bank of America's motive and opportunity to assist the fraud.  *Id.* at 310.  Motive and opportunity were just an alternative ground for satisfying the actual knowledge element of the fraud, they were not an additional requirement.

Equally wrong is defendants' reliance on *Renner v. Chase Manhattan Bank*, 98 Civ. 926, 2000 U.S. Dist. LEXIS 8552 (S.D.N.Y. June 16, 2000).   In *Renner*, the plaintiff argued that two of the defendants, Chase Manhattan Bank and its employee, had actual knowledge of the fraud because both possessed motive and opportunity to assist in commission of the fraud. *Id.* 2000 U.S. Dist. LEXIS 8552, at *29-30, 40-41.   Here notice and opportunity are irrelevant because of the admission of actual knowledge of the fraud.

9

The remaining two cases on which Defendants rely are also unavailing.  In the first case, *Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753. F. Supp. 505, 507, 514 (S.D.N.Y. 1990) (addressing RICO violations predicated on mail and wire fraud) a claim for aiding and abetting fraud was not even asserted, and the Court found there was no evidence that a fraud had occurred. The second case, *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F.Supp. 1308, 1327 (S.D.N.Y. 1997) addressed a claim for fraud, not aiding and abetting, and, in any event, held that motive and opportunity were not a substitute for actual knowledge of the fraud.

Here, the defendants indisputably had knowledge of the fraud so that plaintiffs need not resort to motive and opportunity to demonstrate their knowledge.  In short, in this case there is no need to plead motive and opportunity to support an *inference* of defendants' knowledge of the fraud. *Actual* knowledge is admitted. Thus, the cases cited by defendants are inapposite.  Once the requisite three elements of aiding and abetting fraud are established, as here, there is no need to delve into motive and opportunity.

### E. THE COMPLAINT ALLEGES INDIVIDUAL WRONGS BY EACH OF THE DEFENDANTS

Defendants advance first what they presumably consider their strongest argument:  Mr. Rabin is guilty of 'group pleading' proscribed by applicable law. The alleged group now consists of two defendants.  Even the most cursory examination of the complaint and the facts demonstrate that defendants' argument is meritless.

The Amended Complaint does not allege that Dow Jones and Forbes

10

conspired with each other or that they ever even communicated with each other. The Amended Complaint alleges that *each* of them independently engaged in a course of conduct which damaged Mr. Rabin.

The Amended Complaint sets forth six different occasions which Dow Jones received tainted money and retained it and an equal number of different occasions when Forbes received tainted money and retained it, all with knowledge of the fraud.  Without a group, there is no group pleading.  The specific allegations for each defendant meet all the criteria which defendants claim Mr. Rabin must meet.  CBS received tainted money on or about the dates of each check.  It was thereafter forwarded to defendants, in whole or in part. Each of the defendants retained the money knowing it was tainted.  Each defendant failed to notify Mr. Rabin of their receipt of the money. Each defendant is charged with aiding and abetting a fraudulent scheme involving, for each of them, different specific amounts, different specific dates, different specific publications, and different damages.

The same argument of impermissible "group pleading" was raised by defendants in *Prudential Ins. Co. of America v. Credit Suisse Secs. LLC,* 2013 U.S. Dist. LEXIS 142191, at 54-55 (D.N.J. Sept. 30, 2013). Plaintiff had alleged that "[a]ll of the Defendants had actual knowledge of, and substantially assisted in, the fraudulent scheme." *Id.* at *55.  The Court rejected Defendants' argument of group pleading because plaintiffs had provided sufficient detail about each defendants' role in the process and how those roles put them in a position to know about the misrepresentations. *Id.* at *56.  Similarly, here Mr. Rabin has

11

attached a similar exhibit to his Amended Complaint (Ex. 4), which details each time he was fraudulent induced to send money to CBS for Defendants' publications.   Defendants' admission of knowledge of the fraud makes this case even stronger than *Prudential* where plaintiffs alleged that defendants were in a position to know.  *See also, Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp.2d 292, 316 (S.D.N.Y. 2009) (permitting group pleading of aiding and abetting fraud claim against agent banks and their affiliated investment banks.)

Defendants do not site a single case involving "group pleading" in the context of an aiding and abetting fraud claim. All of their cases are readily distinguishable. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2014 U.S. Dist. LEXIS 86765, at *54 (S.D.N.Y. June 23, 2014) ("bare allegations against the other defendant banks are therefore insufficiently particular to establish a claim under the Commodity Exchange Act); *Morin v. Trupin*, 747 F. Supp. 1051, 1065-1066 (S.D.N.Y. 1990) (pleading lacked specificity "to permit a defendant to discern whether he is being charged with primary conduct or as an aider and abettor, and some idea of the manner in which he is charged with having aided and abetted or committed such" RICO violations); *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006) (to state a claim for fraud the acts of each of the two individual defendants must be plead); and *Sheppard v. Manhattan Club Timeshare Ass'n, Inc.*, 2012 U.S. Dist. LEXIS 72902, at *10 (S.D.N.Y. May 23, 2012) (to state a claim for fraud "plaintiffs must plead circumstances providing a factual basis for scienter for each defendant").

12

Defendants also seek to dismiss the Amended Complaint by adding elements for pleading other causes, not necessary for an aiding and abetting claim.  *See* Defs.' Mem. at 13-14.    *Miller v. Holtzbrink Publrs., LLC*, 2009 U.S. Dist. LEXIS 18973 at *11 (S.D.N.Y., Mar. 3, 2009) (elements for fraudulent inducement claim against defendant), *aff'd* 377 Fed. Appx. 72 (2d Cir. 2010); *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe, & Maw LLP*, 612 F. Supp. 2d 267, 274 (S.D.N.Y. 2009) (requisites to establish a securities fraud claim for misrepresentations); and *Moody v. Morris*, 608 F. Supp. 2d 575, 582 (S.D.N.Y. 2009) (Rakoff, J.) (elements for a fraud claim against defendants), *aff'd* 407 F. Appx. 434 (Fed. Cir. 2011).

In summary, there is no group here, no allegation that there ever has been a group, and no claim by Mr. Rabin against a non-existent group.  His claim is against the two defendants individually.

## POINT II

## THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATION OF GEN. BUS. LAW § 349

The Publishers' own cases show that Plaintiff has asserted a claim pursuant to New York General Business Law § 349 ("GBL § 349").

> To establish a prima facie violation of that statute [GBL § 349], a plaintiff must demonstrate that the defendant is engaging in "consumer oriented" conduct that is deceptive or misleading in a material way, and that plaintiff has been injured because of that conduct (Gaidon v Guardian Life Ins. Co., 94 N.Y.2d 330, 344, 704 N.Y.S.2d 177, 725 N.E.2d 598; see Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 N.Y.2d 20, 24-26, 623 N.Y.S.2d 529, 647 N.E.2d 741; St. Patrick's Home for Aged & Infirm v Laticrete Intl., 264 A.D.2d 652, 655, 696 N.Y.S.2d 117).

*Soule v. Norton*, 299 A.D. 2d 827, 828, 750 N.Y.S.2d 692, 695 (4th Dept. 2002).

Here, unlike the company in *Soule,* the Publishers are directly engaged with consumers, their subscribers. The materially misleading conduct is the fraudulent scheme that generated subscriptions for the Publishers.  The Publishers received the fraudulent payments, which initiated with consumers, did not return the payments to the consumers or notify them of the fraud (except for Dow Jones very late in the game in November, 2013 (after Plaintiff had made all the payments upon which he sues)).

The Publishers claim that *Soule* requires an "agreement or understanding between [the manufacturer] and [the medical practice] to cooperate in any fraudulent or deception scheme" Publisher's Memo at 21. The Publishers fail to point out that the "agreement or understanding" element was examined in *Soule* only because the manufacturer was not "engaged in consumer-oriented conduct that was deceptive or misleading" *Soule*, 299 A.D. at 829, 750 N.Y.S. 2d at 695. The manufacturer was not involved in consumer transactions at all; it only sold a device to the medical practice. Here, the Publishers are interacting with consumers, their subscribers; they are not merely acquiescing in the scheme, but are actively perpetuating the scheme by holding the payments and not notifying their subscribers (at least in any form until November, 2013) that they were receiving fraudulently induced payments.

Once the Court turns to GBL § 349, it need not consider the heightened pleading requirement of Fed. R. Civ. Pro. 9(b):

> [B]ecause § 349 extends well beyond common-law fraud to cover a broad range of deceptive practices, *see Gaidon v. Guardian Life Ins. Co. of Am., 94 N.Y.2d 330, 343, 725 N.E.2d 598, 1999 N.Y. LEXIS 3932, 704 N.Y.S.2d 177 (1999)*, and because a private

14

> action under *§ 349* does not require proof of the same essential
> elements (such as reliance) as common-law fraud, an action under
> *§ 349* is not subject to the pleading-with-particularity requirements
> of *Rule 9(b), Fed. R. Civ. P.*, but need only meet the bare-bones
> notice-pleading requirements of *Rule 8(a), Fed. R. Civ. P.*, *see
> generally Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513, 152 L.
> Ed. 2d 1, 122 S. Ct. 992 (2002)*; *Leatherman v. Tarrant County
> Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168,
> 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)*.

*Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (Rakoff, J.).

The Publishers' main attack on Plaintiff's GBL § 349 Claim is that vendors

need not disclose lower prices or different pricing to consumers if the consumer

does not ask about the lower price. Publisher's Memo at p. 19.  The Publishers

argue that Plaintiff's claim is one merely for a lower price and, thus, does not

state a claim under GBL § 349, The Publishers completely misapply the law they

refer to.

First, the Publishers simply misstate New York GBL § 349 Law. The law is

clear that a higher price paid as a result of fraud is compensable under GBL §

349:

> Under New York law, a premium could constitute an actual injury
> compensable under *Section 349*. See *Cox v. Microsoft Corp.*, 10
> *Misc. 3d 1055A, 809 N.Y.S.2d 480, 2005 WL 3288130, at *5, (N.Y.
> Sup. Ct. 2005)* (sufficient allegations of actual injury where plaintiffs
> alleged that Microsoft was able to charge inflated prices for its
> products as a result of its deceptive actions); see also *Small v.
> Lorillard Tobacco Co., 94 N.Y.2d 43, 720 N.E.2d 892, 898, 698
> N.Y.S.2d 615 (N.Y. 1999)* ("[Plaintiffs'] theory contains no
> manifestation of either pecuniary or "actual" harm, plaintiffs do not
> allege that the cost of cigarettes was affected by the alleged
> misrepresentation.").

*Jernow v. Wendy's International, Inc.*, 2007 U.S. Dist. LEXIS 85104,*8-9;

2007 WL 4116241 (S.D.N.Y. 2007); *Accord: Ackerman v. Coca-Cola Co.*,

2010 U,S. LEXIS 73156, *88-90, 2010 WL 2925955 (E.D.N.Y. 2010)
("Injury is adequately alleged under GBL §§ 349 or 350 by a claim that a
plaintiff paid a premium for a product based on defendants' inaccurate
representations.")

Second, in all the Publishers' cases, the defendants were found not to
have any fraudulent or deceptive practices. Rather they all involve vendors with
multiple pricing based on different circumstances. Just having multiple prices for
different reasons was not, itself, fraudulent or deceptive. For example in *Super
Glue Corp. v. Avis Rent A Car System, Inc.*, 159 A.D. 2d 68, 71, 557 N.Y.S.2d
959, 961 (2d Dept. 1990), the Court found that Avis was not liable for its
expensive refueling charges, not because the only harm was a premium
charged, but because there was no fraud or deception in the manner in which
Avis computed its charges. ("Nor do we find that the manner in which Avis
computes its refueling charge is deceptive or misleading so as to violate *General
Business Law § 349*." *Id*.).

Similarly in *Canestaro v. Raymour & Flanigan Furniture Co.,* 42 Misc. 3rd
1210(a), 984 N.Y.S.2d 630, 2013 N.Y. Misc. LEXIS 6370, *8 (N.Y. Sup. Ct.
2013), the Court found that, in the absence of fraud or deception, negotiations
that end up in excessive prices do not violate GBL § 349. ("The GBL does not
prohibit negotiations pertaining to the price of goods. Price negotiation 'is part of
a time-honored haggling or bargaining process, and is not in itself unlawful'
[Goldberg v. Manhattan Ford Lincoln-Mercury, Inc., 129 Misc 2d 123, 126, 492
N.Y.S.2d 318 (Sup. Ct., NY Cty., 1985)]" *Id*.)

16

Generally, if a consumer asks for a particular price, the vendor is not required to disclose an alternate price that may be more favorable. That is a completely different situation from an intentionally fraudulent scheme which solicits people to extend subscriptions when there is no need to do so or to induce people to pay multiple times for the same thing.  Barron's and the Wall Street Journal characterized the scheme as "Regarding Fraudulent Renewal Notices" (Complaint Ex. 1; Preston Dec. Ex. B). The Fraudulent Renewal Notice scheme is just what GBL § 349 is aimed at.

## POINT III

### THE AMENDED COMPLAINT STATES A CLAIM FOR NEGLIGENCE

The Publishers argue that Plaintiff may not assert a negligence against them because, as a matter of law, there can be no "special relationship" that creates a duty of care from the Publishers to Plaintiff.  While New York law indicates that "special relationships" are a very narrow set of categories, Plaintiff submits that careful analysis of the Publishers' cases leads to the conclusion that on the facts of this case, the Court should find a "special relationship."

The New York Court of Appeals has set forth the parameters necessary to find a "special relationship":

> A duty may arise, however, where there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others. Examples of these relationships include master and servant, parent and child, and common carriers and their passengers.

*Hamilton v. Beretta U.S.A. Corp..* 96 N.Y.2d 222, 233, 727 N.Y.S.2d 7, 13

17

(2001). Under the analysis set forth in Hamilton, the Court should find a "special relationship" between the Publishers and their subscribers on the facts of this case.

Here each publisher is the only entity or person who can protect the subscribers from the fraud and each publisher knows which of its subscribers have been injured by the fraud.  Just as a common carrier has the responsibility for its passengers because it is the only entity to control their fate and the carrier knows exactly who its passengers are, *see Amoruso v. New York City Transit Authority*, 12 A.D.2d 11, 207 N.Y.S.2d 855 (1st Dept. 1960),  the Publishers should have the same responsibility to their subscribers.

The detailed analysis of "special relationship" in the Publishers' lead case, *Kazanoff v. United States*, 945 F.2d 32, 37 (2d Cir. 1991) supports this conclusion.  In that case, plaintiff claimed that the United States had a special relationship with a tenant in a building because a postman had a key to the building and let in two strangers who murdered plaintiff's wife. The Second Circuit reviewed the New York law of "special relationship" and explained why no special relationship existed between the government and the decedent:

> Thus,
>
>> judicial recognition of the existence of a duty of care is dependent upon principles of sound public policy and involves the consideration of numerous relevant factors which include, *inter alia: moral* considerations arising from the view of society towards the relationship of the parties . . .; *preventative* considerations, which involve the ability of the defendant to adopt practical means of preventing injury, . . . the degree of certainty that the alleged injuries were proximately caused by the defendant and the foreseeability of harm to the plaintiff;

18

> *economic* considerations, which include the ability of the defendant to respond in damages; and *administrative* considerations, which concern the ability of the courts to cope with a flood of new litigation.

*Donohue v. Copiague Union Free School District, 64 A.D.2d at 33, 407 N.Y.S.2d at 877* (citation omitted).

…

The district court correctly concluded that these considerations counsel against recognition of a duty of care on the part of the Postal Service to prevent unauthorized entries. First, "moral considerations" argue against the recognition of a special relationship here. The postal carrier is in no different position from any other person whose regular coming and going may justify giving him or her a key to avoid the necessity of having a tenant open the door each time they appear. Indeed, creating a duty on the part of the postal carrier to prevent entry into the building would expose every tenant and every other service person who accepts a key to liability for allowing unauthorized entries into the building, resulting in a "crushing exposure to liability." *Strauss v. Belle Realty Co., 65 N.Y.2d 399, 403, 482 N.E.2d 34, 36, 492 N.Y.S.2d 555, 557 (1985)*. The broad ramifications that would emanate from the implementation of a new duty in this case is an important factor "appropriately take[n] into account in fixing the orbit of duty that will necessarily control other cases as well as this one." *D'Amico v. Christie, 71 N.Y.2d at 89, 518 N.E.2d at 902, 524 N.Y.S.2d at 7*.

Second, the difficulty of defining the scope of a duty to prevent unauthorized entry also weighs against recognition of such a duty. People do not generally shut doors in others' faces, and, in some instances, such behavior puts the person required to shut the door in another's face at risk of injury. To what lengths must a postal carrier go to prevent unauthorized entry? If a polite "I am sorry, you cannot enter here" does not deter intruders, must the postal carrier use physical force to prevent unauthorized entry? Is he or she required to put himself or herself in physical danger to safeguard the premises? Would the carrier be required to screen out all entrants, or only persons who obviously look threatening?

As to "preventative considerations", the violent crime which took place here was, from the postman's perspective at least, an unforeseeable, intervening act which broke the chain of causation between the postman's actions and Mrs. Kazanoff's injury. Moreover, it is by no means certain that having postal carriers block entry into buildings would, as Kazanoff suggests, deter would-be assailants or robbers from entering buildings. Training letter carriers to screen entrants to buildings -- a daunting administrative task --

19

addresses only one of the many ways in which law breakers enter buildings to do injury. When the orbit of the potential liability is recognized and considered together with the reality that little or no public safety increase can be expected from such a rule, there is no policy basis upon which to ground a change in the common law.

Applying the same considerations here, the result is different. As to the "moral considerations", first, while the postal carrier was "in no different position from any other person" who may have had a key to the building, the Publishers are the only entities or persons who could protect their subscribers. Second, while defining the scope of a postal worker's duty to prevent entry is difficult, here the Publishers need only notify their defrauded subscribers and offer back money. There is no difficulty in defining the scope of duty.

As to "preventative considerations," imposing liability on the government for postmen would unlikely lead to preventing harm because even if postmen blocked entry to buildings, evil doers could still obtain access. Here, in contrast, the Publishers acting upon receipt of the fraudulent funds, eliminate or greatly diminish the harm to their subscribers.

Thus, upon consideration of all the policies that underlie the determination of "special relationship," and the fact in this case that the Publishers knew they were receiving fraudulently induced subscription funds, the Court should find a "special relationship" between the Publishers and their subscribers. Such a finding sustains Plaintiff's negligence count.

## Conclusion

Defendants' motion to dismiss should be denied. In the event the Court finds a pleading deficiency, Plaintiff respectfully requests leave to replead.

Dated:    New York, New York
          September 4, 2014

BRAGAR EAGEL & SQUIRE, P.C.

By: s/*Raymond A. Bragar*_____

Raymond A. Bragar
Bragar Eagel & Squire, P.C.
885 Third Avenue, Suite 3040
New York, NY 10022
Phone: (212) 308-5858
Fax: (212) 208-2519
E-mail: bragar@bespc.com

*Attorneys for Plaintiff*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2014, a copy of the foregoing instrument was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of this Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

s/*Raymond A. Bragar*
Raymond A. Bragar

22